UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OPTIMUS HOSPITALISTS & PEDIATRIC SUBSPECIALISTS, LTD d/b/a MIDWEST NEOPED ASSOCIATES, LTD., an Illinois limited company, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.  16 C 7760 |
| FRANCISCAN ALLIANCE, INC. d/b/a FRANCISCAN ST. JAMES HEALTH f/k/a SISTERS OF ST. FRANCIS HEALTH SERVICES, INC. d/b/a ST. JAMES HOSPITAL and HEALTH CENTERS, an Indiana corporation, | ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case requires the court to interpret a professional services contract between a group of "hospitalists"—that is, physicians who provide medical care only to hospitalized patients—and the hospital where they provided services.  Plaintiff Optimus Hospitalists & Pediatric Subspecialists, Ltd. (hereafter "Optimus") argues that the contract obligated Defendant Franciscan Alliance, Inc. (hereafter "Franciscan") to assign certain patients at its hospitals to Plaintiff at least four days per week.  According to Plaintiff, Defendant breached this obligation by assigning those patients to Plaintiff on fewer than four days per week for an unidentified period (or periods) between 2013 and 2015.  Defendant responds that the contract required Plaintiff to "accept" those patients at least four days per week, but only if Defendant exercised its discretion to assign them to Plaintiff.  Defendant counterclaims that Plaintiff failed to perform any of its contractual obligations for a period of one week in December 2013.  Both parties now seek summary judgment on Plaintiff's claim for breach of contract.[1]  For the reasons explained below,

---

<sup>1</sup> Defendant's counterclaim is not at issue here.

the court concludes that the contract is ambiguous, and therefore denies both motions.

## **BACKGROUND**

Most of the facts in this case are undisputed. Plaintiff Optimus is an Illinois corporation with its principal place of business in Oak Brook, Illinois. (Pl.'s Statement of Facts (hereafter "PSOF") [57], at ¶ 1.) At all times relevant to this lawsuit, physicians employed by Optimus provided medical services at certain hospital facilities in the Chicago area, including two facilities owned by Defendant Franciscan, an Indiana nonprofit corporation whose principal place of business is in Mishawaka, Indiana. (Def.'s Statement of Facts (hereafter "DSOF") [61], at ¶ 2.) Defendant's Chicago-area facilities are in Chicago Heights, Illinois, and Olympia Fields, Illinois. (*Id.*)

Both the Chicago Heights and Olympia Fields facilities permit "attending physicians"—that is, primary-care providers who also have "medical staff privileges"—to admit patients to the hospital. (PSOF ¶ 5.) Attending physicians are "responsible for providing, supervising, and/or directing the treatment received" by their patients. (*Id.*) When an attending physician is not available to care for her hospitalized patients, someone else must do so. (*Id.* at ¶ 9.) This service is generally performed by a "hospitalist"—that is, by a physician who "specialize[s] in providing only inpatient care," and does not "maintain a private practice" or "provide primary medical care outside the hospital setting." (*Id.* at ¶¶ 10-13.) When a patient seeks treatment in the hospital's emergency department and subsequently requires inpatient admission to the hospital, Franciscan assigns a hospitalist to supervise that patient's care if the patient does not have a prior relationship with one of the facility's attending physicians. (*Id.* at ¶ 19.) Such patients are referred to as "unassigned patients." (*Id.*)

Physicians employed by Optimus began providing "urgent and on-going medical services" at Franciscan's Chicago Heights facility in the mid-1990s. (*Id.* at ¶ 8.) Although the record does not show the exact terms of the parties' agreement (or agreements) from that period, it appears that at least one Optimus physician was to be "physically present at Chicago Heights, twenty-four

2

hours per day, seven days per week." (*Id.*) This physician would care for patients "when the patients' primary care physician was unavailable." (*Id.*)

**I.      The 2011 and 2013 agreements**

The contract at issue in this case was formed in January 2011 and was amended in March 2013. Although it is the amended (2013) version of the contract that the court is called upon to interpret here, the court concludes that this (amended) contract is ambiguous, as explained below. The court therefore begins by recounting certain provisions of the original (2011) agreement, as well as extrinsic evidence of negotiations between the parties in 2012 and 2013 that could shed light on the intent behind the amendments.

**a.      2011 agreement**

The 2011 contract stated, *inter alia*, that Optimus would be the "exclusive" provider of "the professional services described in <u>Exhibit B</u> ('Services')." (2011 Agreement § 1.1, Ex. 3 to DSOF.) "This exclusive right to provide Services," the contract continued, "shall not apply to any other services." (*Id.*)

Exhibit B to the 2011 Agreement described the various services that Optimus had the exclusive right to perform. These services included, *inter alia*, "[p]rovid[ing] a Designated Professional on-site at each Facility 24 hours per day, seven days per week to serve as the 'Urgent Hospitalist' to provide house coverage"; "[p]rovid[ing] on-site hospitalist service at the Facility located in Chicago Heights for clinical duties 24 hours per day, 365 days per year"; and "[providing] a Hospitalist to make daily rounds and to be available on-call at the Facility located in Olympia Fields." (*Id.* at Ex. B.) Another service was described as follows: "[a]cceptance of any and all unassigned patients who come to the Facility's E[mergency] D[epartment] and who require inpatient admission to the Facility and are assigned to [an Optimus employee] pursuant to the ED

3

call schedule."[2] (*Id.*) So long as Optimus was "not in material breach of any of its obligations under this Agreement," Franciscan would not "extend Medical Staff privileges to any other hospitalist or neonatologist who is not affiliated with [Optimus.]" (2011 Agreement § 1.1, Ex. 3 to DSOF.)[3]

### b. Negotiations leading to amendment

In August 2012, the President and CEO of Optimus informed Franciscan that Optimus was "experiencing very serious, unexpected and unprecedented staffing problems in the Hospitalist Service," and was "frantically working on how to resolve these issues." (Letter of Aug. 31, 2012, Ex. 1 to Senesac Decl., Ex. 5 to DSOF.) The parties do not fully explain the nature of these staffing problems, though it appears that Optimus was experiencing financial difficulties and that at least two of its physicians had resigned. (*See* Supp. Aff. of Udochukwu Asonye (hereafter "Asonye Supp. Aff.") ¶¶ 11-12, Ex. 1 to Pl.'s Statement of Add'l Material Facts (hereafter "PSAMF") [62].)[4]

Presumably because it could not meet its obligations under the 2011 agreement, Optimus "requested amendment" of that agreement. (PSAMF ¶ 11.) During the ensuing negotiations between the parties, Optimus's representative—Dr. Udochukwu Asonye—asked for "a temporary reduction in the number of ED on-call days [Optimus] received from Franciscan Alliance at Chicago Heights." (Asonye Supp. Aff. ¶ 23, Ex. 1 to PSAMF.) Franciscan's representative—Thomas Senesac, the company's Chief Financial Officer—invited Optimus to propose an

---

[2] As noted above, an "unassigned patient" is a patient who does not already have a primary care physician authorized to treat patients at the applicable facility. (Def.'s Resp. to PSOF ¶¶ 19-20.)

[3] "Hospitalists," the parties agree, are physicians who do not maintain private practices, and whose employers (such as Optimus) "contract with hospitals to provide medical care solely and exclusively to hospitalized patients." (Def.'s Resp. to PSOF [58], at ¶¶ 11-14.)

[4] Dr. Udochukwu Asonye of Optimus suggests that Franciscan was experiencing financial difficulties at this time, as well. (Asonye Supp. Aff. ¶¶ 8-9.) Asonye cites no evidence to support this assertion, and he offers no basis for a conclusion that he had personal knowledge of Franciscan's financial position. *See* FED. R. EVID. 602.

arrangement that would limit Optimus's responsibilities. Specifically, Senesac suggested that Optimus could provide "all unassigned ER call for pediatrics" and "a minimum of 4 ER calls a week," as well as either "24/7 in-house adult coverage" or "12/7 in-house adult coverage." (Senesac to Asonye, Dec. 6, 2012, Ex. 1 to Senesac Decl.) It is not clear exactly what Senesac meant by "in-house adult coverage," though the court presumes he was referring to something resembling the "hospitalist" and/or "urgent hospitalist" services described in the 2011 version of Exhibit B.

Two weeks later, on December 21, 2012, Asonye proposed "a 40 Day Transition period through January 31, 2013," during which "Optimus' 24/7 Care Responsibilities will remain for Neonatology/Pediatric and Urgent Hospitalists services but NO ER Calls due to Professional Manpower shortage." (Asonye to Senesac, Dec. 21, 2012, Ex. 1 to Senesac Decl.) It is not clear from the record what Asonye anticipated would happen when the proposed "transition period" ended, or how Franciscan responded to Asonye's proposal.

On February 4, 2013, several days after the end of the proposed "Transition Period," Asonye sent Senesac a document that Asonye referred to as "Counter Proposals for Continuation of the 24/7 In-House Combined Neonatology, Pediatrics, Urgent & Modified Traditional Hospitalist Services at the Chicago Heights Campus." (Asonye to Senesac, Feb. 4, 2013, Ex. 1 to Senesac Decl.) Asonye attached to this "counter proposal" a bullet-pointed list of "Services to be Provided." This list included "Traditional Hospitalist Services" for three categories of patients: "All PHO Patients . . . 7 days/week 365 days/year"; "All WellGroup Patients in Chicago Heights Campus . . . 7 days/week 365 days/year"; and "Unattached ED Patients x2 days/week." (*Id.*) The parties do not explain the meaning or significance of "PHO Patients" or "WellGroup Patients."

The following day, Senesac responded that Franciscan would "agree to modify our current agreement to include . . . [u]nassigned call 2 days per week," but "cannot agree to . . . [e]xclusive access to WellGroup patients as hospitalists." (Senesac to Asonye, Feb. 5, 2013, Ex. 1 to Senesac Decl.) On February 7, Asonye wrote that Optimus would "accept[ ] . . . [u]nassigned

5

Emergency Department Patients 2 days/week," but "request[ed] . . . 4 days per week On-Call and Hospitalist Responsibilities for WellGroup Patients" as well. (Asonye to Senesac, Feb. 7, 2013, Ex. 1 to Senesac Decl.) Senesac apparently rejected this proposal, too, and on February 19 he asked Asonye to "provide the general terms, conditions, and cost under which Optimus would require to provide the following services . . . 5. Acceptance of any and all unassigned patients who come to the ED and require admission a minimum of two days per week." An asterisk next to this item referred to the following text at the bottom of the page: "Will accept Unassigned ED three (3) days/week." (Senesac to Asonye, Feb. 19, 2013, Ex. 1 to Senesac Decl.)

Asonye responded by proposing two alternative arrangements. If Franciscan would agree to guarantee 100% of the fees Optimus sought to collect from "the poor and at this point, uncertain Payor mix" (another term the parties do not explain), Optimus would "accept ED Unassigned Patients three (3) instead of two (2) days a week." Alternatively, if Franciscan gave Optimus access to "PHO and WellGroup Patients at the Chicago Heights Campus 365 days/year," Optimus would "accept ED Unassigned Patients three (3) days a week" with only a 50% collection guarantee. (Asonye to Senesac, Feb. 20, 2013, Ex. 1 to Senesac Decl.) Senesac rejected both proposals and suggested that the parties instead agree to simply terminate their existing agreement. (Senesac to Asonye, Feb. 25, 2013, Ex. 1 to Senesac Decl.)

The parties apparently resumed negotiations in March 2013, though it is not clear what brought Franciscan back to the bargaining table. On March 7, Asonye sent Senesac a revised list of "Services to be provided." (Asonye to Senesac, March 7, 2013, Ex. E to PSOF.) Asonye's list contemplated an increase over time in the number of unassigned emergency patients Optimus would "accept." Thus, Asonye described the proposed "service" Optimus would provide as follows: "Acceptance of any and all unassigned patients who come to the ED and require admission a minimum of two (2) days per week through March 31, 2013 increasing to four days a week, effective April 1, 2013." (*Id.*)

6

Senesac responded with a draft agreement incorporating Asonye's language verbatim. Instead of requiring Optimus to "accept" any and all unassigned emergency patients every day, as the 2011 version of Exhibit B implied, Senesac's draft now required Optimus to "accept" those patients "a minimum of two (2) days per week through March 31, 2013, increasing to four days a week, effective April 1, 2013." (*See* Draft First Amendment to Agreement 4, Ex. F to PSOF.)

Senesac's revised draft also changed the language in the exclusivity provision, which had appeared in section 1.1 of the 2011 agreement. As previously noted, the original version of this provision stated that Optimus would be the "exclusive" provider of "the professional services described in Exhibit B ('Services')," and then subsequently referred to "this exclusive right to provide Services[.]" In Senesac's revised draft, however, one sentence continued to suggest that Optimus would be the exclusive provider of all "Services," while another limited the exclusivity arrangement only to "*neonatal intensive care* Services." (*Id.* at 3 (emphasis added).) Asonye made dozens of changes to the language of Senesac's draft before sending a "red-lined" version back to him. (*See* Ex. G to PSOF; PSOF ¶ 53.) But Asonye left the language relating to exclusivity exactly as it appeared in Senesac's draft. (Ex. G to PSOF, at 4.)

    **c.    Amended agreement**

It is not clear whether any further negotiations took place. What is clear is that, in late March 2013, representatives of the parties signed an amended agreement that made numerous changes in the original agreement, including—but not limited to—the changes noted above. (*See* Amended Agreement, Ex. 4 to DSOF)

The amended agreement's exclusivity provision appears to be identical to Senesac's draft. In one sentence, it designates Optimus as the exclusive provider of "Services." Two sentences later, it appears to limit the exclusivity arrangement to neonatal intensive care services alone. Unlike the original agreement, which designated Optimus as the exclusive provider of the services listed in Exhibit B and then stated that "[t]his exclusive right to provide Services shall not apply to any other services," the amended agreement designates Optimus as the exclusive provider of

7

"Services" and then states that "[t]his exclusive right to provide *neonatal intensive care* Services shall not apply to any other services." (*Id.*) (emphasis added).

The list of services in Exhibit B, meanwhile, was amended in at least two ways that are relevant to this case. First, as in Senesac's draft, the amended Exhibit B incorporates Asonye's language relating to unassigned emergency patients verbatim. Instead of requiring Optimus to "[a]ccept[ ] any and all unassigned patients who come to the Facility's ED and who require inpatient admission to the Facility and are assigned to [Optimus's doctors] pursuant to the ED call schedule," as the 2011 version of Exhibit B did, the amended Exhibit B requires Optimus to "[a]ccept[ ] any and all unassigned patients who come to the ED and require admission a minimum of two (2) days per week through March 31, 2013 increasing to four (4) days a week, effective April 1, 2013." (*Id.*) Second, the amended Exhibit B completely eliminates one of Optimus's services that appeared in the 2011 version: "provid[ing] on-site hospitalist service at the Facility located in Chicago Heights for clinical duties 24 hours per day, 365 days per year." (*Id.* at 5.)

The amended agreement also imposes at least one new duty on Franciscan. Under the heading "Financial Support," Franciscan promises to pay Optimus a $1.25 million "Support Fee" in any year that Optimus's "gross collection for personal services rendered" does not exceed $1.09 million. (*Id.* at 2.) (If Optimus does collect more than $1.09 million for its services, the amount Franciscan must pay is reduced by a designated amount. (*Id.*)) Although this provision grants Franciscan "the right to terminate the Support Fee in its sole discretion at any time," it also states that Franciscan cannot exercise this right unless Optimus "has achieved gross collections goals for Professional Services rendered of $545,000 at least three (3) consecutive six (6) month periods[.]" Assuming this condition is satisfied, Franciscan still must provide written notice to Optimus at least 180 days prior to the effective date of termination. (*Id.* at 3.)

II.     **Subsequent dealings between the parties**

For an unidentified period after April 1, 2013—neither party identifies the precise length of time—Franciscan assigned Optimus four days of "ED call" per week. (PSOF ¶¶ 72; Def.'s Resp.

to PSOF ¶¶ 72.)  At some point in 2013, however, Defendant reduced the number of ED call days it assigned to Optimus to either two days per week (in Plaintiff's account) or three days per week (in Defendant's account).  (PSOF ¶ 73; Def.'s Resp. to PSOF ¶ 73.)

At some point—again, the parties do not say when—Udochukwu Asonye asked Franciscan's Chief Medical Officer, Daniel M. Netluch, to explain why Optimus was not being scheduled to care for emergency patients at least four days per week.  (PSOF ¶ 75.)  The parties dispute how Netluch responded.  According to Plaintiff, Netluch told Asonye to "be patient," assured Asonye that Optimus "would be given four ED call days per week," and explained that Franciscan "had to give some ED days to non-hospitalist primary care physicians who were members of the Medical Staff, in order to assist those physicians in building up their private practices."  (PSOF ¶¶ 76-77.)  Netluch denies that he said any of this.  In Netluch's account, he told Asonye that Franciscan reduced Optimus's ED call days "because Optimus had demonstrated an inability to staff the obligations it contracted to provide."  (Netluch Aff. ¶¶ 5-6, Ex. 1 to Def.'s Statement of Add'l Material Facts (hereafter "DSAMF") [59].)  Although this statement could be interpreted as an admission of, and a justification for, a breach by Franciscan, Netluch also testifies that he "never advised Dr. Asonye or anyone that Optimus was contractually entitled to any number of ED call days."  (*Id.* at ¶ 5.)

Despite Optimus's belief that Franciscan was in breach of the contract, the parties continued to do business with each other until the end of 2015.  At some point in 2014, Franciscan "worked with" Optimus to "create marketing material" that was subsequently displayed at the Chicago Heights facility.  (PSOF ¶ 69; Def.'s Resp. to PSOF ¶ 69.)  This "marketing material" consisted of a poster with three columns of text and images.  In one of the columns, the words "Optimus Group" appear immediately below the heading "Hospitalist Physician Team."  (*See* Ex. I to Asonye Aff.)  In late 2014 and early 2015, Asonye requested "expedited Reinstatement of our 4th On-Call Day" in multiple e-mail messages to Netluch.  (*See* Exs. J-K to PSOF.)  Plaintiff claims that Netluch responded that Franciscan was "working on it," but Netluch denies this, and it

9

appears that none of his responses were preserved in writing. (PSOF ¶ 88; Def.'s Resp. to PSOF ¶ 88.) On July 13, 2015, Franciscan's President and CEO notified Optimus in writing that Franciscan would not seek to extend the parties' agreement when it expired on December 31, 2015. (Ex. L to PSOF.) Franciscan's letter offered no reason for the termination.

## III.    Procedural history

Plaintiff filed this action on August 1, 2016, seeking more than $800,000 for what it characterized as Defendant's breach of both the ED call provision in Exhibit B and the exclusivity provision of the amended agreement. Defendant filed a counterclaim seeking $23,000 for unidentified "services" it alleges Plaintiff was contractually obligated, but failed, to provide between December 23 and December 31, 2013. (Def.'s Counterclaim ¶¶ 4-7.) Both parties now seek summary judgment in their favor on Plaintiff's claims for breach of contract.

## **DISCUSSION**

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When presented with cross-motions for summary judgment, the court is required to adopt a 'Janus-like perspective,' viewing the facts for purposes of each motion through the lens most favorable to the non-moving party." *Moore v. Watson*, 738 F. Supp. 2d 817, 827 (N.D. Ill. 2010) (Gottschall, J.) (quoting *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992) (Shadur, J.), *aff'd*, 9 F.3d 1198 (7th Cir. 1993)).

In this case, there are no genuine disputes about whether Defendant provided Plaintiff with "ED call" patients at least four days per week after April 1, 2013. Defendant concedes that it did not. The only dispute is whether, under Illinois law, the amended contract required Defendant to do so.

"The primary objective" of contract interpretation "is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). Where "the words in the contract are clear and unambiguous," the court must give those words their "plain, ordinary,

and popular meaning," without considering extrinsic evidence of the parties' intent. *Id.* If the language of the contract is ambiguous, however, "a court can consider extrinsic evidence to determine the parties' intent." *Id.*

I. **Ambiguity**

A contract is ambiguous if it "is susceptible to more than one meaning." *Thompson*, 948 N.E.2d at 47. To determine whether a contract is susceptible to more than one meaning, the court must consider the document as a whole, and may not interpret the contract's language "in a manner that would nullify or render provisions meaningless." *Id.*

In this case, Franciscan and Optimus both argue that the amended agreement is only susceptible to one meaning, and each side contends the plain meaning requires judgment in its favor. Both parties cannot be right about this, but "a contract is not rendered ambiguous merely because the parties disagree on its meaning." *Id.* at 48. The court must consider whether the contract is, in fact, "susceptible" to the meaning each party assigns to it.

In Optimus's interpretation, it agreed to supply 100% of Franciscan's need for a particular service—"acceptance" of unassigned emergency patients—on at least four days per week, and Franciscan agreed to purchase that service from Optimus at least four days per week. Although Exhibit B does not by its terms impose such a reciprocal obligation on Franciscan—which a conventional requirements contract must include to be enforceable under Illinois law, *see Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Production, Inc.*, 212 F.3d 373, 379 (7th Cir. 2000)—that obligation can be inferred from certain language in the exclusivity provision, which states that "[Optimus's employees] shall be the exclusive providers of Services at the Facility." *See In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106, 1108 (7th Cir. 1999) (noting that the obligatory return promise can be inferred from an exclusive-dealing provision). Relying on this language, Optimus characterizes the agreement as a conventional requirements contract involving a seller who agrees to supply all the buyer's need for a particular service in return for the right to be the exclusive provider of that service.

11

Franciscan argues that the contract is not, in fact, susceptible to this interpretation, because there is additional language in the exclusivity provision that limits Optimus's right to act as an exclusive supplier to neonatal intensive care services alone, rather than the broader range of services listed in Exhibit B. That language, which appears a mere two sentences after the language on which Plaintiff relies, reads as follows: "This exclusive right to provide *neonatal intensive care Services* shall not apply to any other services[.]" (emphasis added.) Because the exclusivity provision does not apply to the service of "accept[ing]" unassigned emergency patients at least four days per week, Defendant reasons, the court should not infer any reciprocal obligation of Franciscan to refer those patients to Optimus at least four days per week. Instead, Defendant argues, Optimus promised to *accept* any and all unassigned emergency patients requiring inpatient admission at least four days per week, but Franciscan never promised to *refer* any and all such patients to Optimus at least four days per week. In Franciscan's reading, Franciscan reserved the right to refer unassigned emergency patients to physicians unaffiliated with Optimus, even on days when Optimus would have been obligated to accept any such referral it received.

Plaintiff argues that it would be "irrational to assume that Franciscan Alliance entered into a contract with Optimus with the intention of denying Optimus the promised four ED call days per week and of thereby forcing Optimus' breach of the ED call day provision." (Pl.'s Response Br. [63], at 5.) It is, of course, true that an interpretation leading to absurd or unreasonable conclusions should be rejected in favor or one "which makes a rational and probable agreement," *NutraSweet Co. v. American Nat'l Bank and Trust Co. of Chicago*, 262 Ill. App. 3d 688, 695, 635 N.E.2d 440, 445 (1st Dist. 1994). But Plaintiff puts the cart before the horse: it takes as a given that Franciscan "promised" to refer all unassigned emergency patients to Optimus—and only Optimus—at least four days per week. In Defendant's interpretation of the amended agreement, Franciscan never made this promise.

A stronger argument for rejecting Defendant's interpretation is that, if accepted, it might render the contract unenforceable for lack of consideration. "Without exclusivity," some cases

12

assert, "the buyer in a requirements contract has effectively promised nothing of value to the seller." *Torres v. City of Chicago*, 261 Ill. App. 3d 499, 505, 632 N.E.2d 54, 58 (1st Dist. 1994). Because "a construction of a contract which renders the agreement enforceable rather than void is preferred," *933 Van Buren Condominium Ass'n v. West Van Buren, LLC*, 2016 IL App. (1st) 143490, ¶ 37, 61 N.E.3d 929, 940 (1st Dist. 2016), Plaintiff's interpretation appears, at first glance, to be the only one to which the contract is truly susceptible. But a reciprocal promise like the one Optimus asks the court to infer is not the only way to make a contract like this enforceable. *See Torres*, 261 Ill. App. 3d at 505, 632 N.E.2d at 58 (suggesting that "some other form of consideration"—besides a reciprocal promise to purchase the relevant product or service exclusively from the seller—can create an enforceable requirements contract). In this case, Franciscan not only promised to make Optimus the exclusive provider of care for a *different* category of patients—those requiring neonatal intensive care services—it also promised to pay Optimus a "support fee" of $1.25 million per year. This is sufficient consideration for Optimus's promise to "accept" all unassigned emergency patients requiring admission at least four days per week.[5] Defendant's interpretation therefore would not render the contract unenforceable.

The court concludes that the amended agreement is susceptible to both parties' interpretations. As a result, neither party is correct that the contract unambiguously supports its position. The contract is ambiguous, and the court therefore turns to extrinsic evidence to decipher the parties' intent.

---

[5] Although the amended agreement states that Franciscan has a right to "terminate" the support fee "in its sole discretion at any time," it also states that Franciscan can exercise this right only after providing Optimus with 180 days' written notice, and only if Optimus's "gross collections" during the previous 18 months exceeded a designated amount. Franciscan's promise to pay the support fee therefore is not illusory. *See* 3 WILLISTON ON CONTRACTS § 7:13 (4th ed.) (noting that "even a slight restriction on the exercise of the right of cancellation" can be "sufficient to satisfy the requirement of consideration"); *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 37 (8th Cir. 1975) (party's unilateral right to cancel did not make its promise illusory, where one prerequisite to exercising the right was written notice to the other party 30 days prior to cancellation).

**II.      Extrinsic evidence**

Unfortunately, the extrinsic evidence the parties have presented does little to clarify their intent. Defendant first suggests that Udochukwu Asonye's December 21 letter shows that the parties intended for Franciscan to retain the freedom to offer unassigned emergency patients to whomever it chose, in whatever quantity it chose. In this letter, Asonye suggested "a 40 Day Transition period through January 31, 2013," during which "Optimus' 24/7 Care Responsibilities will remain for Neonatology/Pediatric and Urgent Hospitalists services but NO ER Calls due to Professional Manpower shortage." According to Defendant, "[i]t defies logic for Optimus to argue it was fighting for more days [of ED calls] when it started the negotiation by asking for zero days." (Def.'s Memo. in Supp. of Mot. for Summ. J. [54], at 9.)

This argument is not persuasive. Asonye explicitly suggested a temporary elimination of Optimus's obligation to care for unassigned ED patients, not a permanent one. Indeed, even a request for a permanent elimination of that obligation would not establish that the parties intended for *Franciscan* to retain the discretion to assign unassigned emergency patients to Optimus as many days per week as Franciscan chose. The letter says nothing about what the parties intended for Franciscan's obligations to be once the proposed 40-day transition period expired.

Defendant next argues that the removal of certain language from the 2011 version of the contract shows that the parties intended for the amended exclusivity provision to apply only to neonatal intensive care services, not to all the services listed in the amended Exhibit B. The 2011 version of Exhibit B required Optimus to provide "on-site hospitalist service at the Facility located in Chicago Heights for clinical duties 24 hours per day, 365 days per year." This language does not appear in the 2013 version of Exhibit B. In Defendant's view, the removal of Optimus's obligation to provide general "hospitalist" services 24 hours per day, 365 days per year, shows that the parties intended to eliminate Optimus's right to act as the exclusive provider for all but neonatal intensive care services.

This argument is similarly unpersuasive. Defendant does not explain how Optimus's obligation to provide "hospitalist" services was related to its obligation to provide either neonatal intensive care services or the "acceptance" of unassigned emergency patients. Relieving Optimus of the obligation to provide general hospitalist services may shed light on the question of whether the parties intended for Optimus to be the exclusive provider of care for unassigned ED patients at least four days per week. But that possibility is not enough to grant summary judgment in Defendant's favor. A reasonable jury could conclude that the circumstances do not clarify the ambiguous provisions at issue here.

Defendant's extrinsic evidence is not sufficient to grant summary judgment in its favor, but the court concludes that Plaintiff also has not shown it is entitled to summary judgment. As evidence of the parties' intentions in amending their contract in 2013, Plaintiff points to the marketing materials that the parties jointly produced at some point the following year. As described above, these marketing materials consist of a poster on which the words "Optimus Group" appear immediately below the words "Hospitalist Physician Team." Plaintiff suggests that this demonstrates the parties' earlier intent to preserve Optimus's right to act as the exclusive provider of services other than neonatal intensive care services. In the court's view, this vague reference in a poster does not eliminate any disputes of fact. A reasonable jury could conclude that the decision to identify Optimus with the "Hospitalist Physician Team" in 2014 sheds no light on the question whether the parties intended, the previous year, to grant Optimus the right to act as the exclusive provider of services other than neonatal intensive care services.

Plaintiff's only other evidence is either disputed or only vaguely relevant to the question of the parties' intent. Plaintiff claims that Netluch "repeatedly" told Asonye, at various points after April 1, 2013, that Franciscan was "working on" restoring Optimus's fourth day of "ED call."[6] Optimus contends this statement shows that the parties intended for the amended contract to

---

[6] Plaintiff does not argue that Netluch's purported assurances created a new, implied-in-fact contract between the parties, so the court does not consider the question.

give Optimus a right to four days of "ED call" per week. But Netluch denies that he ever said it, and whether he did is a question of fact for a jury. Plaintiff also notes Netluch's explanation for Franciscan's failure to refer all unassigned emergency patients to Optimus four days per week: Optimus's own alleged breach of the contract in December 2013. The court agrees that this explanation could be interpreted as an acknowledgement that the contract did, in fact, require Franciscan to do what Optimus claims it did. But that is not the only way to interpret Netluch's statement. A reasonable jury could conclude Netluch was not invoking Optimus's breach to justify Franciscan's own breach, but rather that he was simply explaining that Franciscan was trying to assign Optimus the amount of work its actions suggested it was capable of performing.

Plaintiff's final argument is that any remaining uncertainty about the amended contract's meaning should be resolved against Franciscan, because Franciscan "drafted" the amended agreement. But Franciscan was not, in fact, the sole drafter of the amended agreement. Optimus's representative offered numerous proposals to alter the text of that agreement, several of which appear to have been included in the document the parties signed. The general rule that an ambiguous contract should be construed against its drafter does not help Plaintiff here. *See Farmers Auto Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 978 (7th Cir. 2007) ("The rule is presumably limited by its logic, and hence to cases in which there is no negotiation over the terms . . . .").

If, after considering extrinsic evidence and relevant canons of contractual interpretation, the court is still unsure of the meaning of a contract, "then the question of interpretation must be left to the trier of fact." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1037 (7th Cir. 1998) (quoting *Countryman v. Industrial Commission*, 292 Ill. App. 3d 738, 686 N.E.2d 61, 64 (2d Dist. 1997)). The extrinsic evidence in this case does little to clarify the meaning of the parties' amended agreement. The court therefore denies both parties' motions for summary judgment.

**CONCLUSION**

Defendant's Motion for Summary Judgment [52] and Plaintiff's Motion for Partial Summary Judgment [55] are both denied. A status conference is set for September 4, 2018, at 9:30 a.m.

ENTER:

Dated: August 20, 2018

_____
REBECCA R. PALLMEYER
United States District Judge