**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OPTIMUS HOSPITALISTS & PEDIATRIC SUBSPECIALISTS, LTD d/b/a MIDWEST NEOPED ASSOCIATES, LTD., an Illinois limited company,** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 16 C 7760** |
| **FRANCISCAN ALLIANCE, INC. d/b/a FRANCISCAN ST. JAMES HEALTH f/k/a SISTERS OF ST. FRANCIS HEALTH SERVICES, INC. d/b/a ST. JAMES HOSPITAL AND HEALTH CENTERS, an Indiana corporation,** | ) ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Optimus Hospitalists & Pediatric Subspecialists, Ltd. ("Optimus") contracted with Defendant Franciscan Alliance, Inc. ("Franciscan") in 2011 to provide certain medical services at two of Franciscan's hospitals.[1] The parties amended the agreement in 2013; disputes concerning the amendments resulted in this lawsuit, in which Optimus charges Franciscan with breaching the amended contract in two ways. First, Franciscan allegedly permitted another provider of similar medical services, Signature Healthcare Solutions ("Signature"), to operate at Franciscan's hospital in Chicago Heights, in violation of Optimus's exclusive rights under the contract. Second, Optimus claims the agreement required Franciscan to schedule its physicians to be on-call at Franciscan's emergency department in Chicago Heights at least four days per week, but Franciscan failed to maintain that schedule. Defendant Franciscan denies having breached the

---

[1]　　　Jurisdiction in this court is secure. *See* 28 U.S.C. § 1332. Optimus is organized in Illinois and has its principal place of business here. Franciscan Alliance is an Indiana non-profit corporation with its principal place of business in Indiana. The amount in controversy exceeds $75,000. (Answer [8] ¶¶ 3–4.)

contract and alleges in a counterclaim that it is Optimus who did so, by failing to provide contractually required services for which it was paid in December 2015.

In an earlier ruling on the parties' cross-motions for summary judgment, the court found the language of the parties' 2013 amended contract ambiguous and concluded that extrinsic evidence offered by the parties did not clarify the meaning of the ambiguous language. *See generally Optimus Hospitalists & Pediatric Subspecialists, Ltd. v. Franciscan All., Inc.*, No. 16 C 7760, 2018 WL 3970146 (N.D. Ill. Aug. 20, 2018) (hereinafter "*Optimus I*"). Franciscan now again seeks summary judgment [101] on Optimus's claims, arguing that discovery has revealed new evidence that does effectively clarify the parties' agreement. Franciscan also seeks summary judgment on its counterclaim. For the reasons explained below, the court denies Franciscan's motion for summary judgment on Optimus's claims. The motion for summary judgment on Franciscan's counterclaim is granted in part and denied in part.

## BACKGROUND[2]

### I. The 2011 Initial Agreement

Optimus provides medical services to hospitalized patients at facilities in the state of Illinois (Def.'s Local R. 56.1 Statement of Facts ("Def.'s SOF") [103] ¶ 1), including two hospitals owned by Franciscan Alliance, one in Chicago Heights ("FAI Chicago Heights"), and one in Olympia Fields ("FAI Olympia Fields"). (*Id.* ¶ 2.) This case involves a dispute between Plaintiff Optimus and Defendant Franciscan over the terms of an amended contract between the parties that took effect in February 2013. Because the terms of a January 2011 contract between Optimus and Franciscan inform the meaning of the 2013 agreement, the court will begin by

---

[2] Franciscan argues that certain of Optimus's responses to its statement of facts do not comply with Northern District of Illinois Local Rule 56.1 and its version of those facts should be deemed admitted. *See* N.D. ILL. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."). The court will not credit factual assertions or denials by either party that are not properly supported.

describing the 2011 contract ("Initial Agreement").[3]  As relevant here, the parties agreed that Optimus would be the exclusive provider of certain hospitalist[4] services at FAI Olympia Fields and FAI Chicago Heights.  (*See* Ex. B to Initial Agreement [103-3], Ex. 3 to Def.'s SOF.)  Recitals to the contract make clear that the purpose of the agreement was to address a shortage of physicians specializing in neonatal and inpatient care.  The recitals explain, further, that the agreement granted Optimus certain rights to exclusivity in order to promote efficient and effective use of Franciscan's resources and to ensure a consistent quality of care.  (*Id.* at 1.)

Exhibit B to the Initial Agreement lists the services Optimus would provide at FAI Chicago Heights and FAI Olympia Fields.  Specifically, as stated in Exhibit B, Optimus agreed to provide certain hospitalist services including, in the first bullet point, a physician "on-site at each Facility 24 hours per day, seven days per week to serve as the 'Urgent Hospitalist'[5] to provide house coverage, to be generally available to address the needs of patients and staff of the acute-care Facility."  (*Id.*)  In a separate subsection of Exhibit B (the fifth bullet point), Optimus agreed to provide "on-site hospitalist service at the Facility located in Chicago Heights for clinical duties 24 hours per day, 365 days per year and to provide a Hospitalist to make daily rounds and to be

---

[3]     Optimus notes that the parties' first contract for medical services at Franciscan hospitals took effect in 1994, but the court will refer to the 2011 contract as the "Initial Agreement" for ease of explanation; none of the parties' earlier contracts is disputed.  (*See* Pl.'s Local R. 56.1 Statement of Additional Facts ("Pl.'s SOF") [109] ¶ 1; Pl's Resp. to Def.'s SOF [108] ¶ 5.)

[4]     The parties define hospitalists as "physicians who specialize in providing only inpatient care . . . solely and exclusively to hospitalized patients."  (Pl.'s SOF ¶ 2); *see also Optimus I*, 2018 WL 3970146, at *2 n.3 (defining "hospitalists" as "physicians who do not maintain private practices, and whose employers (such as Optimus) 'contract with hospitals to provide medical care solely and exclusively to hospitalized patients.'").

[5]     Optimus created the term "urgent hospitalist" and uses it to refer to "hospitalists who round on inpatients like a traditional hospitalist, provide 24 hour in-house coverage at a hospital, and possess specific skills equipping them to provide an urgent response to [an] inpatient's emergent needs."  (Pl.'s SOF ¶ 2.)  Franciscan disputes that "urgent hospitalists" "round on" patients; Franciscan notes that Dr. Udochukwu Asonye, Secretary of Optimus and its primary representative in contract negotiations with Franciscan, distinguished in his deposition testimony between "urgent hospitalists" and "rounding" hospitalists, or traditional hospitalists. (Def.'s Resp. to Pl.'s SOF [113] ¶ 2.)

available on-call at the Facility located in Olympia Fields." (*Id.*)  Optimus also agreed to accept "any and all unassigned patients"[6] who came to each facility's emergency department ("ED") requiring inpatient admission, and who Franciscan assigned to Optimus "pursuant to the ED call schedule" (hereinafter, "ED call provision").  (*Id.*)

Section I of the Initial Agreement contained provisions governing Optimus's right to exclusivity under the contract.  Optimus would be the exclusive provider of the services listed in Exhibit B, "as long as Corporation [Optimus] is not in material breach of any of its obligations under this Agreement, has a sufficient number of hospitalists and neonatologists and is providing all Services required by the Hospital, as provided in this Agreement." (*Id.* § 1.2.)  The provision continues that "Hospital will not during the term of this Agreement extend Medical Staff privileges to any other hospitalist or neonatologist who is not affiliated with Corporation to provide Services at Facility," except for temporary privileges in emergency circumstances when "there is an immediate need for such Services and Corporation is unable to fill the need and/or supply such specialists." (*Id.* §§ 1.2–1.3.)

## II.    The 2013 Amended Agreement

Optimus and Franciscan amended portions of the Initial Agreement in 2013 ("Amended Agreement").  (Am. Agreement [103-4], Ex. 4 to Def.'s SOF; Def.'s SOF ¶ 25.)  Optimus signed the Amended Agreement in March 2013 and Franciscan signed it in April 2013 (*see* Am. Agreement at 9), but it took effect retroactively beginning on February 28, 2013.  (Def.'s SOF ¶ 51.)  The recitals to the Amended Agreement report that Optimus was experiencing "material unforeseen circumstances" such that "the professional fees collected by Corporation . . . have not been sufficient to enable Corporation to continue providing services pursuant to the terms of the Agreement."  (Am. Agreement at 1.)  In particular, due to factors including a "higher than mutually anticipated level of uninsured and underinsured patients," and "increasing compensation/scarcity

---

[6]    An unassigned patient is "a patient who does not have a primary care physician" on staff at the hospital.  (Pl.'s SOF ¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4.)

of Hospitalists willing to cover night shifts," Optimus was suffering net financial losses under the Initial Agreement and had "recent staff attrition and retention problems" that complicated its ability to fulfill its obligations under the Initial Agreement.  (*Id.*)

The parties amended Exhibit B to modify the hospitalist services that Optimus agreed to provide and to make a change in the ED call provision.  The parties dispute the implications of these changes but agree that Optimus physicians would no longer provide hospitalist services at FAI Olympia Fields under the Amended Agreement.  Specifically, with regard to hospitalist services at FAI Chicago Heights, Optimus would provide:

> 24 hour 365 days a year in house adult and pediatric physician coverage by Board Certified / Board Eligible Physicians dual board certified in Internal Medicine and Pediatrics or at Corporation's sole cost, qualified Internal Medicine, Family Practice and Pediatric Physicians to attend to the needs of patients requiring urgent or immediate care at the Chicago Heights Campus of the Facility including but not limited to the [*sic*] responding to any adult or pediatric codes.  All physicians providing the Services shall be designated as "Urgent Hospitalists."

(*Id.* § 3.1.)  This single provision, included as subsection one to amended Exhibit B, replaced the first bullet point in the parties' Initial Agreement.  The amendments also removed the fifth bullet point from the original Exhibit B, which had spelled out Optimus's on-site responsibilities at FAI Chicago Heights and "rounding" duties at FAI Olympia Fields.  The new ED call provision stated that Optimus would accept "any and all unassigned patients who come to the ED and require admission a minimum of two (2) days per week through March 31, 2013 increasing to four (4) ED days a week, effective April 1, 2013."  (*Id.* § 3.7.)

The parties also amended the language of the contract's exclusivity provisions by omitting some instances of the word "hospitalist."  Similar to the Initial Agreement, except omitting a requirement that Optimus maintain a "sufficient number of hospitalists," the Amended Agreement stated that Optimus would be the exclusive provider of Services (defined as the "professional services described in Exhibit B") "as long as Corporation is not in material breach of any of its obligations under this Agreement, has a sufficient number of neonatologists and is providing all Services required by the Hospital, as provided in this Agreement."  (*Id.* § 2.1.)  Using the same

wording as in the Initial Agreement, the amended exclusivity provision continues that "Hospital will not during the term of this Agreement extend Medical Staff privileges to any other hospitalist or neonatologist who is not affiliated with Corporation to provide Services at Facility." (*Id.*) The Amended Agreement did, however, modify an exception to that provision. Whereas the Initial Agreement stated that the Hospital "may extend temporary privileges to other hospitalists or neonatologists unaffiliated with Corporation to perform Services in emergency circumstances where there is an immediate need for such services and Corporation is unable to fill the need and/or supply such specialists" (Initial Agreement § 1.2), the Amended Agreement omitted the word "hospitalists," meaning that under the Amended Agreement, the Hospital could "extend temporary privileges [only] to other neonatologists unaffiliated with Corporation to perform Services" in the same emergency circumstances. (Am. Agreement § 2.1.) Like the Initial Agreement, the Amended Agreement permits Franciscan's Board of Trustees to alter Optimus's "exclusive right to provide Services." (*Id.*) The Amended Agreement notes that Optimus's "exclusive right to provide neonatal intensive care Services"—instead of any type of "Services"— "shall not apply to any other services . . . which are approved by the Board . . . to be performed by other members of the Medical Staff of the Facility." (*Id.*; *cf.* Initial Agreement § 1.1.) Franciscan has not argued that its Board took action to alter Optimus's exclusivity rights during the time the Amended Agreement was in effect.

The parties' dispute in the pending case focuses on the changes made to the exclusivity provisions and the ED call provision in the Amended Agreement. Optimus understood the amended ED call provision to guarantee that, beginning April 1, 2013, Franciscan would assign to Optimus unassigned patients from the emergency department four days every week (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") [107] at 5), while Franciscan believed that the provision gave it the option to assign Optimus four days of ED call per week after April 1, and required Optimus to accept those assigned days, but imposed no obligation on Franciscan to assign any minimum number of days. (Def.'s Mot. for Summ. J. ("Def.'s MSJ") [102] at 4.)

6

Optimus argues that omission of a few, but not all, instances of the word "hospitalist" in the exclusivity provisions of the Amended Agreement was intended to emphasize Optimus's exclusive role in providing neonatology services at FAI Chicago Heights. According to Optimus, Illinois revised its certification requirements for hospitals providing neonatal care prior to the contract's amendment, and because Optimus physicians were the only ones at Chicago Heights who had the required credentials to treat neonatal patients in a hospital unit with a "Level II E" neonatology designation, FAI Chicago Heights was only able to retain that designation because of the credentials of these Optimus physicians. (Pl.'s SOF ¶ 31; Pl.'s Resp. at 3–4.) In Optimus's view, the emphasis on neonatology signaled an expansion in its neonatology responsibilities, but did not alter the scope of its other hospitalist duties at FAI Chicago Heights under the Amended Agreement. (*Id.*) Franciscan contends, instead, that omission of certain instances of the word "hospitalist" as well as the new specification of an exclusive right to provide neonatal intensive care services in the amended exclusivity provisions, paired with the changes to the Services listed in Exhibit B, demonstrate that Optimus was not intended to be the exclusive provider of all hospitalist services at FAI Chicago Heights. (Def.'s MSJ at 3.)

## III. Extrinsic Evidence

Optimus contends that Franciscan violated Amended Agreement in two ways: Franciscan violated the exclusivity provisions by permitting another hospitalist group to provide hospitalist services to adult patients at FAI Chicago Heights. And it violated the ED call provision by failing to schedule Optimus physicians to be on call in the emergency department at least four days per week. In its earlier ruling on the parties' cross-motions for summary judgment, the court held that the Amended Agreement's language delineating the parties' rights and obligations under the contract is ambiguous. The parties have since completed discovery and Franciscan again moves for summary judgment, arguing now that evidence revealed during discovery clarifies the parties' intent at the time they entered into the Amended Agreement.

Franciscan first asserts that the correspondence between the parties during negotiations clarifies the meaning of the disputed provisions. (*See* Def.'s SOF ¶¶ 38–39.) Specifically, Franciscan refers to correspondence between Franciscan's former Chief Financial Officer for the South Suburban Chicago region, Thomas Senesac, and Optimus's Secretary Dr. Udochukwu Asonye. (*See* Ex. 4 to Senesac Dep., Ex. 6 to Def.'s SOF [104-1].)[7] Optimus contends that the written correspondence between Senesac and Asonye does not capture the full intent and state of mind of each party because the negotiations were conducted in part through oral communications. (Pl.'s Resp. to Def.'s SOF ¶ 39.) This court described the written correspondence in detail in its earlier ruling, *see Optimus I*, 2018 WL 3970146, at *2–4; here, the court refers only to those portions of the correspondence, as well as deposition testimony, that is related to negotiation of the Amended Agreement.

Franciscan also argues that a contemporaneous contractual arrangement between a physician group called WellGroup Health Partners, LLC ("WellGroup")[8] and the hospitalist group, Signature, provides context to aid in the interpretation of the Amended Agreement's exclusivity provisions. WellGroup is a group of physicians that operates at FAI Olympia Fields and FAI Chicago Heights. (Def.'s SOF ¶ 59.) Signature is, like Optimus, a provider of hospitalist services, and is effectively a competitor of Optimus. (Pl.'s Resp. to Def.'s SOF ¶ 60.) Initially upon its founding in 2012, WellGroup provided inpatient services for its own patients while they were hospitalized at Franciscan hospitals, and, like Optimus, accepted unassigned patients who were admitted through the emergency department at FAI Olympia Fields and FAI Chicago Heights.

---

[7]    In its Local Rule 56.1 Statement of Facts, Franciscan cites to exhibits to Senesac's declaration in Exhibit 5 but did not include the correspondence as an attachment to the declaration. (*See* Senesac Decl., Ex. 5 to Def.'s SOF [103-5].) Senesac's declaration in Exhibit 5 appears identical to his declaration included as Exhibit 4 to his deposition, which does include attachments, so the court will reference those attachments instead. *See* FED. R. CIV. P. 56(c)(3).

[8]    WellGroup Health Partners, LLC is a limited liability company whose sole member is Franciscan Alliance. (Senesac Dep. 42:17–23.) WellGroup changed its name to Specialty Physicians of Illinois, LLC ("SPI") in 2013. (Miller Dep. 11:12–13, Ex. 11 to Def.'s SOF [104-6].) The parties refer to this entity as WellGroup or WellGroup/SPI, so the court will do the same.

(Def.'s SOF ¶¶ 63–64.)   Sometime later in 2012, WellGroup and Signature contracted for Signature to provide hospitalist services for WellGroup's patients while they were hospitalized at FAI Olympia Fields.   (*Id.* ¶ 65.)   Signature also took over from WellGroup the acceptance of unassigned patients admitted through FAI Olympia Fields's emergency department.   (*Id.*) WellGroup and Signature entered a new contract effective March 1, 2013 that extended Signature's hospitalist duties to WellGroup's patients at FAI Chicago Heights.   (*Id.* ¶ 66.)   On August 28, 2013, WellGroup assigned the 2013 agreement between WellGroup and Signature to Franciscan Physician Network, a division of Franciscan Alliance.   (*Id.* ¶ 68.)   Optimus believes the extension of Signature's hospitalist duties was in violation of Optimus's exclusivity rights.   In Franciscan's view, the WellGroup–Signature contract does not infringe the Amended Agreement; instead, Franciscan contends that WellGroup's arrangement with Signature is evidence that the Amended Agreement did not grant Optimus an exclusive right to provide hospitalist services to all patients at FAI Chicago Heights.   (Def.'s MSJ at 9.)

## IV.   Franciscan's Counterclaim

On July 13, 2015, Franciscan's President and CEO notified Optimus that it would not extend the parties' agreement when it expired on December 31, 2015.   (Pl.'s SOF ¶ 39.)   Asonye testified that Optimus had planned to provide all of the contractually-required services through the end of the year, but one of its doctors left, leaving Optimus unable to cover all of the adult hospitalist shifts during the last week of December with remaining staff.   (Asonye Dep. 173:16– 174:5, Ex. 7 to Def's SOF [104-2].)   In its counterclaim [8], Franciscan contends that it paid Optimus $23,251.51 for "adult services" through the end of 2015, but that Optimus did not provide those contractually required services from December 23 to December 31, 2015.[9]   (Def.'s SOF

---

[9]   Franciscan's Local Rule 56.1 statement of material facts identifies the year when Optimus failed to provide services as 2013 (Def.'s SOF ¶¶ 72–73), but during Asonye's deposition, counsel for Franciscan asked Asonye about services that allegedly were not provided at the end of 2015, not 2013.   (*See, e.g.,* Asonye Dep. 124:2–11.)   Franciscan also originally claimed that Optimus did not provide services starting on December 23, 2013, while Optimus

¶ 73.)  Franciscan claims that Optimus thus breached the Amended Agreement by failing to provide the required adult services, or alternatively, that Optimus has been unjustly enriched by retaining the payment.  Franciscan's counterclaim seeks return of the funds it paid Optimus for services not performed.

Optimus disputes Franciscan's right to relief (*see, e.g.,* Pl.'s Resp. to Def's SOF ¶ 70), but Asonye's deposition testimony on this issue is less than clear.  Asonye conceded that Franciscan paid Optimus some $23,000 for services Optimus had contracted to provide from December 23 to 31, 2015 but that Optimus did not provide.  (Def.'s SOF ¶ 74; Asonye Dep. 126:10–14.)  Asonye also testified that Franciscan later "billed" Optimus for that same amount, but that Optimus has not yet repaid Franciscan.  (Pl.'s Resp. to Def.'s SOF ¶ 74.)  On the other hand, Asonye seemed to imply that Optimus fulfilled at least part of its contractual obligations related to adult care from December 23 to December 31, 2015 because some of its physicians provided the required "adult services" while working "under the aegis of Signature" during that time.  (*Id.* ¶ 73.)  Asonye explained that Optimus did not enforce restrictive covenants it had with its doctors, so they were free to work for Signature, but Asonye did not say that Signature had in fact hired Optimus's physicians during the last week of 2015.  (Asonye Dep. 124:5–9.)  Asonye also testified that Optimus paid the salaries and medical malpractice insurance of those physicians for the whole month of December.  (Pl.'s Resp. to Def.'s SOF ¶ 73.)  Precisely why Optimus did so is also not clear, nor is the court aware whether Optimus would have paid those salaries even had the doctors not worked at FAI Chicago Heights; Asonye stated that Optimus paid "[o]ur own staff, because—the people who are already salaried, their salaries were paid through the end of the year."  (Asonye Dep. 174:15–19.)  Finally, Optimus notes that the $23,251.51 payment from Franciscan did not cover its costs for doctor salaries and malpractice insurance because Optimus did not bill the patients treated by its physicians during the last week of December 2015.  (Pl.'s

---

places the start date at December 24, 2015.  (Pl.'s SOF ¶ 40.)  In its reply brief, Franciscan also cites a December 24 start date.  (Def.'s Reply at 13.)  Neither party explains these discrepancies.

Resp. at 14; Asonye Dep. 126:7–9, 175:11–16.)  Neither party specifies who, if anyone, did bill the patients treated during this time.

## V.    Procedural History

Optimus filed this action in August 2016, seeking more than $800,000 for Franciscan's alleged breach of the exclusivity and ED call provisions of the Amended Agreement.  (Compl. [1] 4–5.)  Franciscan denied the material allegations in Optimus's complaint and sought the return of approximately $23,000 it paid for services that Optimus was contractually obligated to provide, but did not provide, between December 23 and 31, 2013 (or 2015).  (Answer & Countercl. [8].)  The parties filed cross-motions for summary judgment [52, 55] on Optimus's claims only, but the court denied those motions [69], finding that the language of the Amended Agreement was ambiguous, and that extrinsic evidence did not clarify the parties' contractual intent.

After completion of discovery, Franciscan again seeks summary judgment [101], this time both on Optimus's breach of contract claims and Franciscan's own counterclaim.  Franciscan argues that the evidence produced during discovery related to the course of negotiations between Optimus and Franciscan over the Amended Agreement shows that Optimus was attempting to reduce its ED call burden, supporting Franciscan's view that the ED call provision imposed no obligation on Franciscan to guarantee to Optimus any set number of ED call days.  (Def.'s MSJ at 8.)  Franciscan also contends that the 2013 agreement between WellGroup and Signature confirms that the parties did not intend that the Amended Agreement would make Optimus the exclusive provider of all hospitalist services at FAI Chicago Heights.  Indeed, Signature performed hospitalist duties at FAI Chicago Heights beginning in 2013.  (*Id.* at 9.)  Franciscan last asserts that Optimus's failure to maintain adequate staff to meet its contractual obligations throughout the term of the Amended Agreement excuses Franciscan's performance under the contract.  (*Id.* at 9–10.)  Plaintiff, in contrast, views the 2013 WellGroup-Signature contract as a breach of the Amended Agreement, and argues that Defendant's evidence related to the negotiations of the

11

Amended Agreement and to Plaintiff's alleged failure to maintain adequate medical staff to fulfill its contractual obligations is either inadmissible or disputed. (Pl.'s Resp. at 5, 8, 10–11.)

## **LEGAL STANDARD**

The summary judgment standards are familiar: Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A "dispute about a material fact is 'genuine'" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views the record in the light most favorable to the nonmoving party, and draws all inferences in its favor. *Id.* at 255. When the nonmovant bears the burden of proof at trial, it must put forth "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The moving party in such cases need not present evidence that "affirmatively negates an essential element of the non-moving party's case," but instead may show that there is no reason for trial by pointing "to an absence of evidence to support an essential element of the non-moving party's case." *BNSF Ry. Co. v. Gilster-Mary Lee Corp.*, No. 15-CV-250-JPG-SCW, 2017 WL 1164943, at *2 (S.D. Ill. Mar. 29, 2017) (citing FED. R. CIV. P. 56(c)(1)(A)–(B)); *see also Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013).

The parties agree that Illinois law governs their dispute, and under Illinois law, the "construction of a contract presents a question of law," *Gallagher v. Lenart*, 226 Ill. 2d 208, 219, 874 N.E.2d 43, 50 (Ill. 2007), that is "particularly suited to disposition by summary judgment." *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988); *see also Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 587 (7th Cir. 2012) ("Even when a contract is ambiguous, as long as the extrinsic evidence bearing on the interpretation is undisputed and leads to only one reasonable interpretation, we can decide the matter on summary judgment.").

## DISCUSSION

I.      **Plaintiff's Breach of Contract Claims**

As noted, Optimus asserts that Franciscan violated the Amended Agreement by failing to assign to Optimus four days of ED call per week beginning sometime after April 2013. Optimus also argues that Franciscan breached the exclusivity provisions of the Amended Agreement when Signature began providing hospitalist services for WellGroup's patients. Franciscan disagrees on both points. In Franciscan's view, Exhibit B of the Amended Agreement, listing the services Optimus would provide at FAI Chicago Heights, records Optimus's duties under the contract to accept any days that Franciscan chose to assign, but imposes no corresponding obligations on Franciscan. Moreover, Franciscan contends, the Amended Agreement made Optimus the exclusive provider of only "urgent" hospitalist services at FAI Chicago Heights, not "traditional" hospitalist services, and does not create any right to provide care to WellGroup's patients.

A court's "primary objective" in construing a contract "is to give effect to the intention of the parties," looking first "to the language of the contract itself." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). "Intention" in this context "refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware." *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 75, 34 N.E.3d 1132, 1150 (1st Dist. 2015). Contracts are read "as a whole, viewing each provision in light of the other provisions," rather than "viewing a clause or provision in isolation." *Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47. If the words in a contract "are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Id.* A contract's language is ambiguous, however, when it is "susceptible to more than one meaning." *Id.* A court interpreting an ambiguous contract may "consider extrinsic evidence to determine the parties' intent," *id.*, including "the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation." *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 102, 34 N.E.3d at 1157 (citation omitted).

13

The court's earlier ruling on the parties' cross-motions for summary judgment explains the source of the ambiguity in the contract's language and the extrinsic evidence that the parties initially offered. Based on that record, the court could not decide as a matter of law whether Optimus was entitled to four days of ED call weekly, or instead was simply required to accept that many days should Franciscan choose to assign them, nor whether the contract made Optimus the exclusive provider of all hospitalist services at FAI Chicago Heights, or merely some hospitalist services for some patient groups. This opinion therefore discusses only whether the parties' newly presented extrinsic evidence clarifies the ambiguity in the contract's language.

### A.    Emergency Department Call Days

In Exhibit B of the 2013 Amended Agreement, the parties agreed that "Corporation [Optimus] through its Designated Professionals shall perform the following Services: . . . Acceptance of any and all unassigned patients who come to the ED and require admission a minimum of (2) days per week through March 31, 2013 increasing to four (4) days a week, effective April 1, 2013." (Am. Agreement § 3.7.) Optimus reads that provision as requiring Franciscan to assign to Optimus a minimum of four days of ED call per week, and alleges that Franciscan breached the contract by failing to do so after April 2013. (Pl.'s Resp. at 5; Pl.'s SOF ¶ 26; *see also* Apr. 2013 Schedule, Ex. 10 to Miller Dep. [104-6].) Franciscan views the ED call provision as imposing no obligation on Franciscan. (Def.'s MSJ at 4.) Instead, Franciscan asserts that all of its contractual obligations were listed in separate sections of the contract. (*Id.* at 5.) The ED call provision, in Franciscan's view, required Optimus to accept a minimum of four days of ED call each week if Franciscan chose to assign ED call days, but Franciscan could, consistently with the contractual language, assign to Optimus zero days of ED call. (*Id.* at 4–5.) The court previously held that the Amended Agreement is susceptible to both interpretations. *Optimus I*, 2018 WL 3970146, at *7. The issue here, therefore, is whether the newly presented extrinsic evidence clarifies this ambiguity.

14

As in its initial motion, Franciscan argues that negotiations between Franciscan and Optimus confirm the parties' intent to reduce Optimus's ED call obligations in response to its acknowledged staffing problems. The parties' Initial Agreement permitted Franciscan to assign to Optimus anywhere from zero to seven days of ED call per week. (Def.'s SOF ¶ 55; Pl.'s Resp. to Def.'s SOF ¶ 58 (not disputing that Optimus might be assigned zero ED call days under the initial agreement, but noting that Optimus usually received three or four ED days per week).) In late 2012, Asonye sent an e-mail to Senesac in which he acknowledged that Optimus was having trouble staffing the ED shifts required by the Initial Agreement and requested a reduction of Optimus's assigned ED days. (Pl.'s Resp. to Def.'s SOF ¶¶ 39–40.) Franciscan interprets this exchange as Asonye opening negotiations for the Amended Agreement by requesting relief from ED call obligations entirely, and asserts that during the negotiations that followed, Asonye expressed a willingness to accept four ED call days only if the Amended Agreement also granted Optimus access to better-paying patient groups or if Franciscan agreed to pay Optimus more. (Def.'s Reply [114] at 9.) Franciscan notes, further, that throughout the term of the Amended Agreement, Asonye repeatedly complained about the burden of Optimus's ED call day responsibilities. (Def.'s SOF ¶ 41.) Asonye himself acknowledged in his deposition testimony that maintaining staffing to cover Optimus's assigned ED call was not profitable. (Asonye Dep. 79:14–20, 135:4–7). In Franciscan's view, these circumstances establish that the parties intended to decrease the number of days that Optimus would have to accept ED call under the Amended Agreement. (Def.'s MSJ at 8.)

Optimus refutes this interpretation of the events leading up to the renegotiation of the contract. Optimus asserts that in 2012, Optimus's ED call schedule became erratic as a consequence of broader staffing and financial issues at FAI Chicago Heights. (Pl.'s SOF ¶¶ 8–9.) In support, Optimus notes Senesac's testimony that, in 2012, financial problems at FAI Chicago Heights were serious enough that Franciscan considered selling the hospital. (Senesac Dep. 82:6–16; *see also* Netluch Dep. 122:11–123:2, Ex. 8 to Def.'s SOF [104-2].) Senesac also

testified that two senior members of Franciscan's administrative staff left Franciscan's employment. (*Id.* 83:23–84:10.) Optimus has not offered admissible evidence causally linking this broader context to Optimus's own staffing difficulties, *see Optimus I*, 2018 WL 3970146, at *2 n.4, but in any case, in 2012, two of Optimus's doctors at FAI Chicago Heights also left, leading Optimus to become temporarily overburdened by its unpredictable ED call schedule. (Pl.'s SOF ¶ 8.) To address these issues, Asonye testified that he (or another Optimus employee) calculated that Optimus would need four guaranteed ED call days per week to cover its projected cost of employing an adequate number of physicians, and requested assignment of a fixed number of ED days per week so that Optimus could better plan its staffing needs. (*Id.* ¶ 17; Asonye Dep. 112:12–24.) Optimus further contends that it actually opened negotiations by requesting a minimum of four days of ED call per week based on these calculations (Pl.'s Resp. at 11; Pl.'s SOF ¶ 14; *see also* Nov. 30, 2012 Proposal from Asonye to Senesac at 326, Ex. 5 to Senesac Dep.), and that the reduction to two days of ED call per week was always intended to be temporary while Optimus reorganized its staff. (Pl.'s SOF ¶ 16.)

The court reviewed similar evidence presented in the parties' earlier motions. As before, the evidence does little to clarify whether the ED call provision was intended to impose an obligation on Franciscan. *Optimus I*, 2018 WL 3970146, at *7–8. Whether the parties intended to reduce Optimus's assigned ED days temporarily or permanently is disputed. But regardless of the court's finding on that issue, the court would remain uncertain about the dispositive issue here: whether the amended contractual provision imposed a mandatory obligation on Franciscan to assign four ED call days per week after April 1, 2013, or instead whether Franciscan retained the discretion to assign unassigned emergency patients to Optimus as many as four or as few days per week as Franciscan chose. *See id.* at *8. Accordingly, evidence of the course of negotiations does not mandate entry of summary judgment in Franciscan's favor.

Franciscan has presented some additional evidence of the parties' statements and conduct after the Amended Agreement's formation in support of its position. "Illinois courts clarify

16

ambiguous contract language based on general circumstances around contract formation but only actual conduct subsequent to formation." *Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1029 (7th Cir. 2020); *see also Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1021, 538 N.E.2d 205, 211–12 (2d Dist. 1989) ("When a contract is ambiguous or silent on a disputed issue, a court may, in order to determine the intent of the parties at the time of contracting, consider the contemporaneous or subsequent acts of the parties to the contract."). Dr. Daniel Netluch, Franciscan's Chief Medical Officer, testified that, beginning sometime in early to mid-2015, Asonye repeatedly told Netluch that he (on behalf of Optimus) wanted to leave the adult hospitalist[10] business entirely. (Def.'s SOF ¶ 41; *see also, e.g.,* Netluch Dep. 69:16–19, 71:15–72:3; Ex. 8 to Netluch Dep. at 1661.) Asonye himself explained that he wanted Optimus to concentrate on providing hospitalist and neonatology services rather than staffing ED on-call days. (Asonye Dep. 72:2–8.) But any expressions of desire on Asonye's part to leave the adult hospitalist business sometime in 2015 hardly constitute conclusive evidence of party intent at the time of negotiations in 2012 and 2013. More importantly, there is no indication that Asonye's statements to Netluch affected Asonye's view of Optimus's rights and obligations under the contract nor Optimus's performance under the contract. Evidence in the record shows that Asonye repeatedly requested from Netluch that Optimus be assigned four ED call days per week beginning in 2013, which is consistent with Optimus's current position regarding its contractual rights and inconsistent with Franciscan's interpretation that Optimus wanted to rid itself of all contractual responsibility for ED call in 2013. (Pl.'s SOF ¶ 29; Netluch Dep. 56:16–57:1, 63:17–20; *see also* Ex. 3 to Netluch Dep; Exs. 1.J & 1.K to Pl.'s SOF.) Given the ambiguity of both the contract's language and the extrinsic evidence, summary judgment on Count I of Optimus's complaint is not appropriate.

---

[10]    Netluch testified that he understood the "adult hospitalist" business to include both hospitalist shifts and ED days. (Netluch Dep. 118:4–13.)

## B.    The Exclusivity Provisions

Franciscan seeks summary judgment in its favor on the interpretation of the exclusivity clause as well.  The parties raise two basic disputes regarding the effect of the amendments to their contract in this round of briefing.  First, Franciscan briefly disputes whether the Amended Agreement gave Optimus the right to be the exclusive provider of all hospitalist services at FAI Chicago Heights, or solely of "urgent" hospitalist services.  Second, the parties disagree about whether the Amended Agreement's exclusivity provision meant that Optimus physicians also had the exclusive right to provide care for patients of the physician group, WellGroup.  If so, Optimus's exclusivity rights were violated when another hospitalist group, Signature, began providing care for WellGroup's patients at FAI Chicago Heights in 2013.  Franciscan separately asserts that Optimus breached the Amended Agreement by failing to have adequate staff to fulfill its contractual obligations at various times throughout the contract term, and that this breach excuses Franciscan's own alleged breach of the exclusivity provisions.

### 1.    Traditional Versus Urgent Hospitalist Services

Franciscan contends that, because the entire fifth bullet point listing Optimus's "traditional" hospitalist responsibilities was removed from Exhibit B to the Amended Agreement, Optimus's right to exclusivity was limited in the Amended Agreement to solely "urgent" hospitalist services at FAI Chicago Heights.  Optimus argues that the modifications in amended Exhibit B simply combined into one paragraph the hospitalist obligations that had been listed in two separate bullet points in the Initial Agreement.  (Pl.'s Resp. at 10.)  The only practical effect of this change was, thus, to limit Optimus's exclusive hospitalist rights to FAI Chicago Heights; it did not eliminate them or otherwise narrow their scope.  Franciscan hints at the distinction between "urgent" and "traditional" hospitalist duties in its motion for summary judgment ([101] ¶ 15) and its memorandum in support ([102] at 3–4), but only clearly argues that Optimus's exclusivity rights were limited to "urgent" hospitalist services in its reply memorandum ([114] at 5–6) and its response to Plaintiff's statement of facts (Def.'s Resp. to Pl's SOF ¶¶ 32, 38).  The argument may

18

thus be waived; the court will nonetheless explain why the argument does not entitle Franciscan to judgment as a matter of law.

In its earlier ruling, the court addressed in greater detail the inferences to be drawn from the contract amendments. The court explained there why the alterations to the contract do not clearly indicate party intent to eliminate Optimus's exclusive right to provide all hospitalist services at FAI Chicago Heights. *See Optimus I*, 2018 WL 3970146, at *8. The newly presented evidence does little to clarify the interpretation of ambiguous language in Exhibit B describing the hospitalist services Optimus would provide at FAI Chicago Heights. There is, as Franciscan notes, evidence that Optimus distinguished between "urgent" and "traditional" hospitalist services. (*E.g.* Exs. 3–4 to Netluch Dep.) This evidence does not definitively establish, however, which services the parties intended the Amended Agreement to cover.

It is Optimus's position that the services Signature provided at FAI Chicago Heights beginning in 2013 violated Optimus's exclusive rights under the Amended Agreement. Franciscan has not provided clear evidentiary support for its contrary position. That is, Franciscan has not shown that the urgent/traditional hospitalist distinction maps onto the services that Signature actually provided in a way that mandates summary judgment in Franciscan's favor. (*Cf.* Def.'s Reply at 6.) In addition to having different understandings of Optimus's exclusivity rights under the Amended Agreement, it appears to the court that the parties define the "urgent" and "traditional" hospitalist roles differently. Optimus contends that the Amended Agreement did not remove any of its hospitalist duties at FAI Chicago Heights (*see* Pl.'s Resp. at 4–5), and Asonye testified that the "urgent" hospitalist role performed by Optimus's physicians included some hospitalist duties that Franciscan characterizes as "traditional." (Asonye Dep. 19:9–16.) It is not clear from the record that there was not, in fact, any overlap in the duties performed by Signature and Optimus physicians, or that Signature physicians did not perform any tasks exclusively assigned to Optimus by contract. Accordingly, Franciscan is not entitled to judgment as a matter of law based on the urgent/traditional hospitalist distinction.

### 2. WellGroup/SPI Patients

The second dispute over the correct interpretation of the exclusivity provisions concerns whether Optimus was permitted to care for WellGroup's patients. As an initial matter, the court notes that the Amended Agreement between Franciscan and Optimus neither expressly includes, nor expressly excludes, WellGroup patients from the coverage of the exclusivity provisions. (Am. Agreement §§ 2–3.) Franciscan insists that WellGroup's patients were nonetheless entirely outside the scope of the agreement between Franciscan and Optimus. Optimus, in contrast, argues that it had the exclusive right to provide hospitalist services to all patients at FAI Chicago Heights and that Franciscan violated that right by permitting Signature to provide hospitalist services to WellGroup patients in its FAI Chicago Heights location. In support of its view that any of Optimus's rights to exclusivity under the Amended Agreement did not extend to WellGroup's patients, Franciscan first cites the March 2013 hospitalist contract between WellGroup and Signature, and second to Asonye's (and by extension, Optimus's) knowledge that Signature provided hospitalist services to WellGroup's patients at FAI Olympia Fields beginning in 2012. As explained below, neither circumstance entitles Franciscan to summary judgment on this issue.[11]

Franciscan asserts that the Amended Agreement cannot be interpreted to mean that Optimus was the exclusive provider of *all* hospitalist services to *all* patients at FAI Chicago Heights because WellGroup contracted with Signature to provide hospitalist services to WellGroup patients at FAI Chicago Heights beginning on March 1, 2013. (Def.'s MSJ at 9; Def.'s SOF ¶ 66.) In Franciscan's view, the WellGroup-Signature contract reflects an intent to revoke Optimus's

---

[11] As an aside in its response to Plaintiff's statement of facts, Franciscan asserts that Franciscan had no power to contract over hospitalist services for WellGroup patients. (Def.'s Resp. to Pl.'s SOF ¶ 38; *see also* Senesac Dep. 92:23–93:1.) This differs from Franciscan's admission in its Answer that it "at times" "contracted with Signature Healthcare Solutions, S.C. to provide hospitalist services in the Hospital." (Answer ¶ 22.) Franciscan was the sole member of WellGroup, an LLC (Pl.'s SOF ¶ 26; Senesac Dep. 42:17–23), and there is some evidence that Franciscan employees participated in negotiating the contract between WellGroup and Signature (*see, e.g.*, Miller Dep. 29:6–24, 36:4–37:16, 41:8–42:3, 63:4–8; Ex. 5 to Miller Dep.), and that WellGroup needed Franciscan's approval prior to entering contracts. (Miller Dep. 42:8–43:5.)

exclusive right to provide all hospitalist services at FAI Chicago Heights and to transfer some of that work to Signature. (Def.'s MSJ at 9; Def.'s SOF ¶ 67.) But this is not the only reasonable inference that can be drawn from the WellGroup-Signature contract. Senesac testified that neither he nor Asonye knew about the WellGroup-Signature contract until after they completed negotiations for the Franciscan/Optimus Amended Agreement and until after that Amended Agreement took effect. (Pl.'s SOF ¶ 37; Senesac Dep. 80:2–21.) If no one negotiating the Amended Agreement had contemporaneous knowledge of the WellGroup-Signature contract, that WellGroup-Signature contract has little, if any, probative value for an interpretation of the Amended Agreement. Because the negotiating parties were unaware of it, the court agrees with Optimus that WellGroup's contract is not properly considered to be part of "the circumstances surrounding the formation of [the] contract," *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 102, 34 N.E.3d at 1157, and that a reasonable jury could not infer that the parties amended the exclusivity provisions to account for the 2013 WellGroup-Signature contract.

Franciscan next argues that Dr. Asonye knew Signature provided hospitalist services at Franciscan's other facility, FAI Olympia Fields, prior to 2013 and therefore must have understood that it was not the exclusive hospitalist provider to all patients at Franciscan's facilities. Franciscan points to Senesac's testimony that during negotiations of the Amended Agreement in 2012, Asonye wrote that Optimus might need temporary help from Signature to staff some of Optimus's hospitalist shifts. (Senesac Dep. 80:22–81:16; *see also* Dec. 13, 2012 Letter from Asonye to Senesac, Ex. 9 to Pl.'s SOF [109-2]; Dec. 21, 2012 Letter from Asonye to Senesac, Ex. 4 to Senesac Dep. at 302.) Asonye's letters do show that he knew Signature was working at FAI Olympia Fields in 2012. Asonye also directly testified to this effect and stated "[w]e had no concern about that." (Asonye Dep. 82:7–8.) Asonye's knowledge of Signature's activities at FAI Olympia Fields in 2012 is not, however, a decisive indicator of which of Optimus's services the parties intended to be exclusive under the Amended Agreement.

21

In Franciscan's view, because Optimus had never before been permitted to provide hospitalist services to WellGroup's patients, it is clear that Optimus was not the exclusive provider of all hospitalist services at FAI Chicago Heights under the Amended Agreement. (Def.'s MSJ at 9.) But Optimus draws a clear distinction between inpatient care provided by a physician to his or her own patients, on the one hand, and hospitalist services, provided to unassigned patients or patients whose physicians are not at the hospital when inpatient care is needed, on the other. (*See, e.g.*, Pl.'s Resp. at 3; *see also* Asonye Dep. 67:3–19 (explaining that Optimus's right to be the exclusive provider of hospitalist services did not apply to WellGroup physicians caring for their own patients); *see also* Pl.'s SOF ¶ 3 (clarifying the meaning of the term "hospitalist").) Optimus agrees that it did not provide hospitalist services to WellGroup's patients prior to the Amended Agreement (Sulayman Dep. 30:8–14, Ex. 10 to Def.'s SOF [104-5]; Asonye Dep. 92:22–93:5), but disputes the implication that it did not have the exclusive right to do so at FAI Chicago Heights after the Amended Agreement took effect. In Optimus's view, when WellGroup's physicians provided inpatient care for their own patients, WellGroup was not acting as a hospitalist,[12] so WellGroup's pre-2013 arrangement at FAI Chicago Heights did not implicate the terms of the agreement between Franciscan and Optimus. That is, it was only when WellGroup contracted with a hospitalist provider, Signature, to cover WellGroup's patients at FAI Chicago Heights that Franciscan violated Optimus's exclusive right to provide hospitalist services.

Franciscan notes that Optimus never challenged Signature's provision of hospitalist services to WellGroup patients at FAI Olympia Fields beginning in 2012 as a violation of the exclusivity provisions in the Initial Agreement. It follows, Franciscan contends, that the parties did not intend for Optimus to have access to WellGroup's patients under the Initial Agreement and that this intent remained constant when the parties amended their contract. (Def.'s Reply

---

[12] Craig Miller, Executive Director of WellGroup/SPI, stated that, to his knowledge, WellGroup never entered a contract whereby its own physicians would act as hospitalists at FAI Chicago Heights. (Miller Dep. 32:1–6, Ex. 11 to Def.'s SOF.)

at 12.) The court disagrees that this is the only conclusion that can be drawn. Optimus's acknowledgement that Signature provided hospitalist services to WellGroup patients at FAI Olympia Fields in 2012 is not inconsistent with its claim in this lawsuit: Optimus alleges only a violation of its exclusive hospitalist rights at FAI Chicago Heights beginning in 2013, and there is no evidence that Signature or any other hospitalist aside from Optimus provided hospitalist services at FAI Chicago Heights prior to 2013. (*See* Senesac Dep. 75:12–16.) Optimus's contemporaneous knowledge of the 2012 WellGroup-Signature hospitalist contract at Olympia Fields, thus, is not dispositive of Optimus's rights under a separate, later, contract involving a different hospital. The non-waiver provision in both the Initial and Amended Agreements further limits the conclusions that can be drawn from Optimus's failure to object to Signature's providing hospitalist services at FAI Olympia Fields in 2012. (*See* Initial Agreement § 7.5 ("The failure of either party to exercise any right . . . given to it hereunder, . . . shall not constitute a waiver . . . with respect to any other or subsequent breach hereof.").)

The parties' understandings of the contract terms diverge (*compare* Senesac Dep. 92:3–93:1 (Optimus's contract did not cover WellGroup patients), *with* Asonye Dep. 33:5–14 (Optimus had the exclusive right to provide hospitalist services to all patients at FAI Chicago Heights, including WellGroup patients)). And interpreting the significance of the facially inconsistent evidence in the record requires weighing the evidence and making credibility determinations, which is not appropriate on summary judgment. The court concludes that the WellGroup-Signature contracts do not mandate entry of summary judgment for Franciscan.

There is one further issue concerning the exclusivity provisions in the Amended Agreement. Optimus claims that Franciscan violated those provisions when it extended medical staff privileges to Signature to act as hospitalists at FAI Chicago Heights in 2013. (Pl.'s Resp. at 4; *see also* Am. Agreement § 2.1 ("Hospital will not . . . extend Medical Staff privileges to any other hospitalist or neonatologist.").) Franciscan counters by explaining that its bylaws establish just one credentialing process for both Franciscan facilities, meaning that once Signature

23

physicians had credentials to practice at FAI Olympia Fields in 2012, they were immediately permitted to practice at FAI Chicago Heights and Signature physicians did not need new, separate privileges to perform under the 2013 contract between Signature and WellGroup. (Def.'s Resp. to Pl.'s SOF ¶ 22; Def.'s Reply at 7–8.) The deposition of Dr. Netluch (Netluch Dep. 143:6–16), cited by Franciscan on this score, does not support Franciscan's position because Dr. Netluch did not testify to the credentialing process in 2012 prior to his employment with Franciscan. Franciscan also cites the deposition of Senesac (Senesac Dep. 72:21–73:8), but this, too, is unhelpful; Senesac stated that the 2012 Signature-WellGroup agreement limited its coverage to FAI Olympia Fields. (*Id.* at 73:9–18.) In any case, Franciscan believes it is entitled to summary judgment to the extent that Optimus's only argument for an alleged breach of the exclusivity provision is based on the credentialing issue. But the court understands Optimus's argument about staffing privileges to be in addition to its argument that Franciscan violated its right to "be the exclusive provider[ ] of Services at the Facility." (*See* Am. Agreement § 2.1.) As the court reads Optimus's argument, Optimus has identified the credentialing provision as additional support for its position—that is, if the contract prohibits Franciscan from extending Medical Staff privileges to any other hospitalist, it follows that Optimus was meant to be the exclusive provider of hospitalist services at FAI Chicago Heights. Even assuming Franciscan's medical staff bylaws governing physician credentials support Franciscan's position, those bylaws are not sufficient to support summary judgment in the context of the evidence already discussed.

### 3. Excuse of Franciscan's Alleged Breach of Contract

As its final defense to the alleged breach of exclusivity provisions, Franciscan argues that any right to exclusivity Optimus may have had was discharged when Optimus breached the Amended Agreement. (Def.'s MSJ at 10.) Optimus disputes having breached the Amended Agreement and argues that Franciscan has not presented admissible evidence of such a breach. Section 1.2 of the Amended Agreement contains the same basic exclusivity provisions as in the Initial Agreement, except that the parties removed the requirement that Optimus maintain

sufficient "hospitalists." Instead, the Amended Agreement provides that "as long as Corporation is not in material breach of any of its obligations under this Agreement, has a sufficient number of neonatologists and is providing all Services required by the Hospital, as provided in this Agreement, Corporation shall be the exclusive providers [*sic*] of Services at the Facility." (Am. Agreement § 2.1.) Franciscan asserts that Optimus breached the Amended Agreement by failing to employ enough hospitalists to satisfy its contractual obligations and by refusing to accept some ED call days. (Def.'s SOF ¶ 69.) Optimus disputes the admissibility of much of Dr. Netluch's testimony concerning the alleged breach, however, and the remaining undisputed evidence does not establish that Optimus in fact breached the Amended Agreement. Instead, the cited evidence shows, at most, that Optimus may have had insufficient staff sometime in 2014. Franciscan has not explained how a 2014 breach by Optimus would retroactively excuse Franciscan's performance under the contract beginning in March 2013.

Some of Netluch's testimony does suggests that Optimus may have been unable to consistently fulfill its obligations under the Amended Agreement. For example, Netluch testified that at various times while the Amended Agreement was in effect, he "became aware" that Optimus did not have sufficient neonatologists or hospitalists to satisfy its obligations under the agreement.[13] (Netluch Dep. 138:22–139:6; *see also id.* 63:24–64:19, 155:9–21, 156:12–14.) Netluch further testified that he and Asonye discussed in July 2014 some calls that Netluch had received from unspecified individuals in the emergency department regarding Optimus hospitalists' refusals to accept admission of patients from the emergency department. (*Id.* 153:11–154:14; *see also* Ex. 8 to Netluch Dep. at 1663.) Additionally, Netluch stated that Optimus doctor Kathy Behler told him that she was working too many hours or too many shifts in mid to

---

[13] Netluch also testified that, before December 2013, Signature staff was brought to Chicago Heights because Optimus could not cover its ED call shifts. (Netluch Dep. 58:12–59:3.) But as Optimus notes, Netluch has no personal knowledge of these events because they occurred prior to the start of his employment with Franciscan in December 2013. (*See* Pl.'s SOF ¶ 34; *see also Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

late-2014 (*id.* 31:8–32:22); that around early 2015, Optimus started bringing in other physicians to cover shifts that its own employees could not cover (*id.* 33:4–34:17); and that Dr. Asonye, Dr. Behler, and unspecified nurses all reported to him that Optimus was understaffed. (*Id.* 103:8–23.) On the other hand, Netluch also acknowledged that Optimus's assigned shifts were covered during mid to late-2014. (*Id.* 32:1–32:22.)

As Optimus notes, Franciscan, the proponent of Netluch's testimony, has not shown that it is all admissible—some of the testimony lacks foundation or appears to be based on hearsay. (Pl.'s Resp. at 8.) Even were it admissible, Optimus disputes that Netluch's testimony establishes that Optimus breached the Amended Agreement. Optimus acknowledges that it experienced staffing difficulties in 2012, prior to the effective date of the Amended Agreement, and that it did not staff its required shifts in late December 2015. (Asonye Dep. 68:19–69:6, 99:3–23, 126:10–23; *see also* Netluch Dep. 175:8–20 (explaining that Optimus stopped providing adult hospitalist services in December 2015 prior to the termination of the Amended Agreement).) But having difficulty staffing shifts does not necessarily constitute a breach of the agreement, and a 2012 breach of the Initial Agreement is not evidence that Optimus was in breach of the Amended Agreement. Asonye further testified that Optimus always had enough staff to meet its obligations under the Amended Agreement, including ED call, except in December 2015. (Asonye Dep. 143:13–21.) More importantly, Optimus contends that Franciscan itself breached the Amended Agreement starting in March 2013, when Signature began providing hospitalist services at FAI Chicago Heights, and in spring or early summer 2013 when Optimus stopped receiving assignments of four days of ED call per week at FAI Chicago Heights. Even crediting Netluch's testimony, it would establish only that Optimus breached the Amended Agreement in mid-2014. Franciscan cites no authority for its assertion that a 2014 breach on the part of Optimus excuses Franciscan's performance obligations under the contract all the way back to March 2013.

In sum, Franciscan has not presented undisputed evidence showing that Optimus in fact breached the Amended Agreement prior to Franciscan's own alleged failure to comply with the

26

exclusivity provisions.  Nor does the evidence produced during discovery resolve ambiguities in the contractual language regarding whether Optimus had an exclusive right to provide hospitalist services at FAI Chicago Heights under the Amended Agreement.  Accordingly, Franciscan's motion for summary judgment on Count II of Optimus's complaint is denied.

## II.    Franciscan's Counterclaim

Franciscan last moves for summary judgment on its counterclaim [8] against Optimus, seeking return of $23,521.51 that it paid for "adult services" that Optimus was contractually obligated to provide between December 24 and 31, 2015,[14] but that Optimus did not provide. Franciscan alleges that Optimus's retention of the $23,521.51 for services it did not provide constitutes breach of the Amended Agreement or supports a claim for unjust enrichment. Optimus contends that there are disputed factual issues that preclude entry of summary judgment in favor of Franciscan on this claim, including whether Franciscan's own breach of the Amended Agreement excused Optimus's performance.   Ultimately, however, Optimus admits that "Franciscan paid Optimus $23,000 in December 2015, and Optimus did not provide services from December 24, 2015 to December 31, 2015."  (*See* Pl.'s Resp. at 14.)  That admission warrants summary judgment for Franciscan on the issue of Optimus's liability on the counterclaim. Whether the nature of the remedy to which Franciscan is entitled is characterized as contract damages or restitution, and the amount that is owed, are disputed.

To prove unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *Cleary v.*

---

[14]    Again, the actual dates when Optimus allegedly did not provide "adult services" are not clear from the record.  Franciscan's counterclaim and opening brief claims that Optimus did not provide services from December 23, 2013 to December 31, 2013 (Def.'s MSJ at 11; Countercl. at 9), Optimus's response brief places the dates at December 24, 2015 to December 31, 2015 (Pl.'s Resp. at 14), and Franciscan's reply also lists December 24, 2015 to December 31, 2015 as the dates when Optimus did not provide the required services (Def.'s Reply at 13).

*Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 545 N.E.2d 672, 679 (1989)). Unjust enrichment is a "condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence," *All. Acceptance Co. v. Yale Ins. Agency, Inc.*, 271 Ill. App. 3d 483, 492, 648 N.E.2d 971, 977 (1st Dist. 1995), or by contracts "implied in law." *Perez v. Citicorp Mortg., Inc.*, 301 Ill. App. 3d 413, 425, 703 N.E.2d 518, 526 (1st Dist. 1998). A plaintiff may plead unjust enrichment in the alternative to a breach of contract, but unjust enrichment does not apply when "an express contract, oral or written, governs the parties' relationship." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25, 983 N.E.2d 1044, 1052 (1st Dist. 2012). Under Illinois law, "[o]nce a valid contract is found to exist, quasi-contractual relief is no longer available." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).

Under these principles, Franciscan would not be entitled to recover on a theory of unjust enrichment because Franciscan's counterclaim relies on the existence of a valid contract—it seeks repayment of $23,521.51 because Optimus allegedly did not provide services it was obligated to provide under the Amended Agreement. But Optimus contends that its performance obligation under the contract for the period of December 24–31, 2015 was excused by Franciscan's alleged breach of the Amended Agreement's exclusivity and ED call provisions. (*See* Pl.'s Resp. at 14–15.) Optimus is correct that under Illinois law, "a material breach of a contract provision will justify nonperformance by the other party."[15] *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 33, 976 N.E.2d 1014, 1025 (1st Dist. 2012) (citing

---

[15] Conversely, "a partial breach by one party does not justify the other party's subsequent failure to perform; both parties bay be guilty of breaches, each having a right to damages." *Hallberg*, 2012 IL App (1st) 092385, ¶ 33, 976 N.E.2d at 1025 (citation and alterations omitted). A breach is "material" if it is "so substantial and fundamental as to defeat the objects of the parties in making the agreement, or [if] the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *Id.* ¶ 43, 976 N.E.2d at 1027 (citation omitted). The parties did not brief whether Franciscan's alleged breaches of the Amended Agreement were "material," nor did Franciscan respond to Optimus's contention that Optimus's performance was excused.

*Israel v. Nat. Canada Corp.*, 276 Ill. App. 3d 454, 460, 658 N.E.2d 1184, 1190 (1st Dist. 1995)).

"[W]hat constitutes a material breach is a question of fact which involves a fairly detailed inquiry,

which should be left for the trial." *Enter. Warehousing Sols., Inc. v. Capital One Servs., Inc.*, No.

01 C 7725, 2002 WL 406976, at *3 (N.D. Ill. Mar. 15, 2002); *see also Hallberg*, 2012 IL App (1st)

092385, ¶ 43, 976 N.E.2d at 1027.   But even assuming Franciscan's breach of the Amended

Agreement was material, excuse of Optimus's performance would not authorize Optimus to retain

payment for services it did not provide, or relieve Optimus from an obligation to pay restitution for

the services for which Franciscan paid.   *See* RESTATEMENT (SECOND) OF CONTRACTS § 374(1)

(2019 ed.) ("[I]f a party justifiably refuses to perform on the ground that his remaining duties of

performance have been discharged by the other party's breach, the party in breach is entitled to

restitution for any benefit that he has conferred by way of part performance or reliance in excess

of the loss that he has caused by his own breach.").

Drawing inferences in favor of Optimus, a reasonable jury could conclude that Optimus

did partially perform its obligation to provide adult services from December 24, 2015 to

December 31, 2015.   True, Dr. Asonye admitted a breach:   Specifically, Asonye admitted that

Optimus was paid approximately $23,000 for services related to the care of adult patients at FAI

Chicago Heights that it did not provide (Asonye Dep. 126:2–14), that Franciscan "billed" Optimus

$23,000 which Optimus has not yet paid (*id.* 126:14–17), and that Optimus owes $23,000 to the

hospital (*id.* 126:18–23).   Asonye also testified, however, that when Signature provided the adult

care that Optimus otherwise would have provided, it was some of Optimus's doctors who provided

that care, and that Optimus paid the salaries and malpractice insurance of its doctors who worked

for Signature through the end of 2015.[16]   (*Id.* 124:5–9, 125:12–14, 174:9–16.)   Asonye further

---

[16]      In support of the proposition that Optimus paid the salaries of some Optimus
doctors who provided adult services through Signature from December 24, 2015 to December 31,
2015, Optimus submits a document containing a list of unpaid salaries through December 23,
2015.   (Pl.'s SOF ¶ 8 (citing Ex. 8 to Pl.'s SOF).)   Optimus does not identify which doctors on the
list provided care through Signature, nor does Optimus explain how a list of unpaid salaries
through December 23, 2015 establishes that salaries were paid through December 31, 2015.

testified, albeit indirectly, that he wrote to Franciscan's CEO, suggesting that some of Optimus's costs should be offset against the $23,000 reimbursement that Franciscan requested. (*Id.* 175:17–176:9.) Copies of that correspondence are not in the record.

Given the lack of clarity in the record, the court cannot determine as a matter of law whether the fact that Optimus paid some of its doctors to provide "adult services" "under the aegis" of Signature constitutes partial performance under the Amended Agreement. It is not clear whether Optimus would have had to pay its doctors' salaries and malpractice insurance through the end of 2015 regardless of whether they continued working. Franciscan argues that Optimus would have paid the malpractice insurance of its doctors who worked at FAI Chicago Heights for Signature through the end of the year anyway because those doctors also worked at other hospitals (Def.'s Resp. to Pl.'s SOF ¶ 40), but provides no evidentiary support for this assertion. Franciscan also cites Optimus's statement of facts to suggest that Optimus would have paid the doctors' salaries even had they not worked the last week of December, but the cited portion of the record refers to events in 2012 and therefore does not support Franciscan's assertion. (Def.'s Reply at 14 (citing Pl.'s SOF ¶ 10).) On the other hand, Asonye himself suggested, albeit in vague terms, that Optimus might have paid its doctors through the end of the year regardless of whether they worked.[17] (*See* Asonye Dep. 174:9–175:1.)

Paying the salaries of Optimus physicians who worked for Signature during the last week of December 2015 may reduce the amount Optimus must repay Franciscan, but does not negate

---

[17]     Specifically, when asked whether Signature began providing the adult services Optimus had contracted to perform, Asonye answered "Yes. I told them they could use our people, which they did. Our people who were still staying, they utilized them and we covered them and we paid them through the end of the year." Asonye was then asked, "Who did you pay through the end of the year?" and responded, "Our own staff, because—the people who are already salaried, their salaries were paid through the end of the year." Counsel then asked Asonye to clarify, "When you're referring to your own staff, are you referring to the staff that was providing the services at Chicago Heights through Signature?" and Asonye said, "Yes, those who remained, but because some people had left, there were some gaps left. So we told them we couldn't do all of it." (Asonye Dep. 174:9–175:1.)

its liability; Asonye admitted that Optimus did not provide all of the adult services required by its contract. There are, however, additional issues regarding the amount for which Optimus is liable. First, Optimus notes that it did not bill patients treated by its doctors working through Signature for the period of December 24 to 31, 2015, and that it is unclear who, if anyone, billed those patients. (Pl.'s Resp. at 14; Pl.'s SOF ¶ 40.) It appears that patient billing was a separate source of revenue for Optimus, beyond the payments it received from Franciscan. (*See* Asonye Dep. 126:7–9 ("We didn't bill patients either. We were paid the component of the hospital.").) Optimus has not explained whether Franciscan received payments from those patients and consequently earned revenue as a result of Optimus's failure to perform under the contract that it would not otherwise have received. Whether or how Optimus's failure to bill patients reduces the amount it owes Franciscan is also unexplained.[18] Second, Optimus asserts that Franciscan has not disclosed what, if anything, it paid to Signature during December 24–31, 2015, but has not explained how payments to Signature would affect Franciscan's recovery on its contract with Optimus. (Pl.'s Resp. at 14; Pl.'s SOF ¶ 40.) Finally, Optimus asserts that the $23,000 payment from Franciscan did not cover Optimus's expenses from December 24 to 31, 2015. (Pl.'s Resp. at 14.) Optimus has not developed this argument, for example, by explaining whether Franciscan paid Optimus a flat fee or a fee that adjusted based on Optimus's expenses.

The court agrees with Franciscan that Asonye's admission that Optimus was paid for services it did not perform entitles Franciscan to judgment on the issue of Optimus's liability on counterclaim. But based on Franciscan's own potential liability on Optimus's contract claims, and the factual disputes identified by Optimus, the amount Franciscan is entitled to recover, if anything, is disputed and may differ from the requested $23,251.51. Accordingly, the court grants

---

[18] Contract damages are based on the loss to the plaintiff (here, Franciscan), not the gain to the defendant. *See Schlueter v. Latek*, 683 F.3d 350, 353 (7th Cir. 2012). A party should not be made better off by the damages it recovers than it would have been had the contract been fully performed, but Optimus has not developed this argument. *Santorini Cab Corp. v. Banco Popular N. Am.*, 2013 IL App (1st) 122070, ¶ 26, 999 N.E.2d 46, 52 (1st Dist. 2013).

Franciscan's motion for summary judgment on the issue of Optimus's liability on the counterclaim only. The amount of recovery, if any, to which Franciscan is entitled will be determined separately.

## <u>CONCLUSION</u>

Franciscan's motion for summary judgment [101] is granted in part and denied in part. Disputes of fact preclude summary judgment on Plaintiff Optimus's breach of contract claims. Franciscan is entitled to summary judgment on its counterclaim as to liability only.

ENTER:


Date:   September 14, 2020

REBECCA R. PALLMEYER
United States District Judge